UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES,

        Plaintiff,

                                    Case Number 11-20574-BC
v.                                   Honorable Thomas L. Ludington

JEFFREY SCHUETT,

        Defendant.

_____/

**OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS**

In this case, the question is whether the temporary detention of a pedestrian who police have probable cause to believe has committed a traffic infraction violates the Fourth Amendment. Put more simply, may the police stop a person that they see breaking the law?

**I**

On the evening of July 19, 2011, four police officers were patrolling a "high intensity drug trafficking area" of Saginaw, Michigan. Travelling in an unmarked vehicle, they saw Defendant Jeffrey Schuett walking down the center of a sidewalk-lined street.

"Where sidewalks are provided," the Michigan Vehicle Code provides, "a pedestrian shall not walk upon the main traveled portion of the highway." Mich. Comp. Laws § 257.655(1). Violating this state traffic law constitutes civil infraction. § 257.655(2). "A police officer who witnesses a person violating [the Michigan Vehicle Code]," the code also provides, "may stop the person, detain the person temporarily . . . and prepare . . . a written citation, which shall be a notice to appear in court." § 257.742(1).

Observing Defendant violate § 257.655(1), the officers stopped their vehicle. Detective Dustin Box, discussing why they decided to stop, explains:

> [I]t's a regular thing for us when we're doing the HIDTA [high intensity drug trafficking area] interdiction, because we know in high known drug activity areas, when people are walking in the middle of the street, that they are most likely going to have something on them that they shouldn't have.

Suppression Hr'g I Tr. 22:2–6, May 30, 2012 ("Suppression Hr'g I"), ECF No. 26. He elaborates:

> [W]e drive through — drive through high drug trafficking areas or high crime areas and we locate people who are doing such things as walking down the street or committing other civil infractions that we can stop and talk to them and see if they do have anything or if they know of anybody else that may have something that may be drug- or firearm-related. . . .
>
> [W]e know — we use the state ordinance that you can't — can't walk on a roadway when there are sidewalks available. When we see people using the roadway as a sidewalk, we can — we will stop and talk to them, either make sure they don't have anything on them, get them off the road, make sure that they know they can't walk in the roadway. So that was one of our —that was our main decision on [why] to stop.

Suppression Hr'g I Tr. 38:6–14, 39:16–23. Recounting what happened after the officers stopped the vehicle, Detective Box recalls:

> [W]e observed the gentlemen walking down the middle of the road. So as we pulled up to the intersection, they were walking north and we were heading east and our vehicle . . . stopped somewhere [in] that intersection . . . .
>
> There was two — two males, one was a white male [later identified as Defendant] and one was a black male [later identified as Jameson Wilson] and there was another subject on the sidewalk [later identified as Calvin McReynolds], walking kind of parallel with them. . . .
>
> When I — when I first got out of the vehicle, Detective-Lieutenant Uribe was talking to the white subject and Detective Guilbeaux was talking to the black subject in the roadway. . . .
>
> Mr. Schuett attempted to — from what I could see, was attempting to turn away from Detective-Lieutenant Uribe and like in an attempt to walk away from him in front of our vehicle . . . .

> I walk[ed] around the other — the back of the truck to get around to where Detective-Lieutenant Uribe [was] because I [knew] just with experience, if someone isn't listening to you and trying to turn away from you, they are either going to run or attack you and I didn't want Detective-Lieutenant Uribe to be alone with the guy.

Suppression Hr'g I Tr. 9:20–22, 11:3–6, 13:4–6, 13:15–20, 39:3–6. Approaching Defendant, Detective Box recounts, he called out "Please turn around." Suppression Hr'g I Tr. 26:12, 34:22. Defendant did. Officer Box continues:

> We [were] in a triangle pattern. Both me and Detective-Lieutenant Uribe [were] facing Mr. Schuett and we were talking to him. . . .
>
> He wasn't really paying too much attention to us. He kept like swiping at his shorts, like his right side of his shorts . . . .
>
> When he was rubbing at his pants or grabbing at his pants, he had pulled them taut or tight to where I could see the outline of the gun plain — plainly. . . .
>
> I said, do you have a gun in your pocket and at that point, Mr. Schuett kind of shrugged as if he was going to turn away, kind of turned his head. . . .
>
> [H]e looked like he was going to reach down towards his pocket again so I went and I just grabbed whatever was in his pocket, knowing that it was a gun and I grabbed it and twisted it to make sure he couldn't go for it. . . .
>
> At that point, myself and Detective-Lieutenant Uribe took him to the ground. Another detective, Detective Guilbeaux, came over and assisted us and put him into custody.

Suppression Hr'g I Tr. 13:25–14:3, 15:1–3, 15:18–20, 16:6–8, 16:10–14, 17:2–4.

Detective-Lieutenant Mark Uribe largely corroborates Officer Box's account of the encounter, recalling that after stopping the vehicle to speak with Defendant,

> I said "police" . . . [and] started walking up to him. At that point, Mr. Schuett then took off, went towards like east, away from where Mr. Wilson was, where the other guy was walking in the road was, which was really suspicious to me. . . .
>
> I was saying, hey, I want to talk to you, stop. He kept on walking. I didn't see him look at me at all, just kept on walking. . . .

> I then [saw] Detective Box coming from my right, coming from behind him and at one point in time, [Defendant] kind of turned towards me.
>
> As soon as he kind of turned towards me and Detective Box was kind of towards his backside there, I then seen in his right pocket, some kind of a point, like a point sticking out like there was something in his pocket. . . .
>
> [I]t reminded me of when I wear my weapon in my pocket, you put it in your pocket, there is no holster to it. It kind of sags down. It looked like it was the barrel of a gun, like the point of a gun. . . .
>
> I asked, "What's in your pocket?" And he didn't say anything. . . .
>
> [W]hen I said, "What's in your pocket," then I — I [saw] Detective Box came over and I [saw] Detective Box put his hand on that right pocket and squeeze that object in his pants and that clearly could see a barrel, look like the barrel of the gun where he was squeezing the pants.
>
> Then once Box got a hold of that object in his pocket, you could clearly see a barrel to me, looked like a barrel to me . . . . I'm not sure if I yelled "Gun" or if Detective Box yelled "Gun" but at that time, I grabbed [Defendant] by the arm and he went down. Box and I took him down to the ground.
>
> I'm not sure if Schuett put his hand over Detective Box or not but it was right near that same area and it wasn't until we went to the ground, that he was stiffened up, that I felt like maybe his hand was down there. It was down there somewhere. I'm not sure if it was up against the gun or it was down near the gun but he was stiff at that point in time. . . .
>
> I know after we got on the ground, Detective Guilbeaux [then] assist[ed] us in the arrest.

Suppression Hr'g I Tr. 55:5–9, 55:25–56:2, 56:23–25, 57:24–58:2, 58:6–10, 58:23–24, 59:3–6, 60:5–10, 60:22–61:3, 62:9–10

    Detective Shannon Guilbeaux reports the encounter transpired as the other officers recall. He recounts that it began when a fellow officer said "hey, there are some guys right there, let's make contact with them." Suppression Hr'g I Tr. 73:22–23. The officers' vehicle stopped in the intersection that Defendant was approaching. Exiting the vehicle, Detective Guilbeaux recounts,

> There was Mr. Schuett and Mr. Wilson were in the roadway. We approached them. When I got out of the passenger, Mr. Wilson stopped and we —like I said,

-4-

> identified ourselves as police officers and Mr. Wilson had stopped. I went to make contact with him. Mr. Schuett turned around. At that time, I heard him say "fuck" and started walking back towards the sidewalk. . . .
>
> I made contact with Mr. Wilson. When I looked back towards [Defendant's] direction, Detective-Lieutenant Uribe and Box were standing near him, trying to make contact with him. . . .
>
> At some point, Detective Box stated, "He's got a gun," and that drew my attention back towards those guys. And I started going in their direction and before I got towards them, they had Mr. Schuett on the ground and Detective Box had his hand on a pocket or I'm assuming an object and Mr. Schuett did, too. It appeared that they were struggling with each other and I assisted Detective-Lieutenant Uribe with getting Mr. Schuett's hands behind his back and securing him.

Suppression Hr'g I Tr. 76:9–14, 78:15–17, 79:5–12. Finally, the fourth officer present that evening, Detective-Sergeant John Trafelet, largely corroborates the testimony of the other three officers. He recalls that he was driving the officers' vehicle that evening when he observed Defendant walking in the street:

> We were — that evening, we were driving — I was driving in my undercover vehicle. It's a white Ford Escape. . . .
>
> I observed two people walking in the middle of the road or in the roadway on Harris and one person up on the sidewalk. . . .
>
> They were — they were walking down the street. They were walking in the northbound lane of Harris. We've seen people crossing the street. They cross on an angle. Their direction is more towards the curb. [Defendant and Mr. Harris, however,] were walking parallel with it. They were walking in the street. . . .
>
> I don't recall specifically but I believe I would have said, "Yes, let's make contact." . . .
>
> I exited — exited the car and made contact with Mr. McReynolds up on the sidewalk.

Suppression Hr'g Tr. 6:19–20, 7:17–19, 8:14–15, 10:4–5, 16:7:11, July 30, 2012 ("Suppression Hr'g II"). While talking with Mr. McReynolds, Detective-Sergeant Trafelet recounts,

> I heard the yelling, some commotion, basically. [Defendant] was going — he was being placed on the ground. He was already on the ground, actually, and then at that point, I heard somebody say "gun," so that alerted me that there was a gun.

Suppression Hr'g II Tr. 11:14–18.

In Defendant's pocket the officers found a .22 caliber semiautomatic pistol. After the officers placed Defendant under arrest and read him his *Miranda* rights, Defendant told them that "because [of] the area he was in he had to carry [the gun] for protection."

Following Defendant's arrest, a grand jury in the Eastern District of Michigan returned an indictment charging him with violating 18 U.S.C. § 922(g)(1), which prohibits felons from possessing firearms.

On March 6, 2012, Defendant moved to suppress the pistol that police found in Defendant's pocket, as well as the incriminating statement that he made. ECF No. 16. The evidence should be suppressed, Defendant asserts, because the police lacked reasonable suspicion to initiate the stop and lacked probable cause to seize him. The statement should be suppressed as fruit of the poisonous tree. The government disagrees, arguing that the evidence should not be suppressed because the encounter was consensual. Arguing in the alternative, the government further argues that even if the stop was compelled rather than consensual, the evidence should not be suppressed because the police had cause to stop Defendant — by walking down the middle of the street, he was committing a civil infraction.

On May 30, 2012, an evidentiary hearing was held on Defendant's motion to suppress. Officers Box, Uribe, and Guilbeaux testified. The fourth officer present on the day Defendant was arrested, Detective-Sergeant Trafelet, was unavailable. Therefore, the hearing was continued. On July 30, 2012, a second evidentiary hearing was held. Detective-Sergeant

Trafelet testified. At the conclusion of the hearing, the Court took the motion to suppress under advisement.

For the reasons detailed below, the Court now denies the motion. Briefly, although the encounter was not consensual, the officers had probable cause to initiate a stop: they observed Defendant committing a traffic infraction.

**II**

"The right of the people," the Fourth Amendment guarantees, "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV.

"This inestimable right of personal security belongs as much to the citizen on the streets of our cities," the Supreme Court observes, "as to the homeowner closeted in his study to dispose of his secret affairs." *Terry v. Ohio*, 392 U.S. 1, 8–9 (1968). "Of course," the Court cautions, "the specific content and incidents of this right must be shaped by the context in which it is asserted." *Id*. at 9. "The Amendment's touchstone is reasonableness, which is measured in objective terms by examining the totality of the circumstances." *Ohio v. Robinette*, 519 U.S. 33, 34 (1996).

The continuum of encounters between police officers and citizens in public places is organized into three discrete categories. *United States v. Campbell*, 486 F.3d 949, 953–54 (6th Cir. 2007) (quotation omitted) (citing *United States v. Bueno*, 21 F.3d 120, 123 (6th Cir.1994)). The first category includes "consensual encounters in which contact is initiated by a police officer without any articulable reason whatsoever and the citizen is briefly asked some questions." *Id*. The second category includes temporary, nonconsensual encounters (or "*Terry* stops"), which require reasonable suspicion that the citizen is involved in unlawful activity. *Id*.;

*see Terry*, 392 U.S. at 30. The third category includes arrests based on probable cause. *Id.*; *see generally* Craig S. Lerner, *The Reasonableness of Probable Cause*, 81 Tex. L. Rev. 951, 1019–22 (2003) (discussing variables that should factor into the assessment of probabilities in particular factual contexts).

### A

"[L]aw enforcement officers do not violate the Fourth Amendment merely by approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen." *Campbell*, 486 F.3d at 954 (quoting *Florida v. Royer*, 460 U.S. 491, 497 (1983)). As the Sixth Circuit explains, "The police must be able to approach the public at large in order to make reasonable inquiries. It would be a sorry state of affairs if police officers were prohibited from speaking with the general public." *United States v. Tillman*, 963 F.2d 137, 142 (6th Cir. 1992).

In such consensual encounters, "no seizure has occurred for purposes of the Fourth Amendment. A seizure occurs when under the totality of the circumstances, a reasonable person would have believed that he or she was not free to walk away." *United States v. Alston*, 375 F.3d 408, 411 (6th Cir. 2004) (quotation marks omitted) (quoting *United States v. Saperstein*, 723 F.2d 1221, 1225 (6th Cir.1983)). Thus, the key to determining whether an encounter is the type of casual encounter that does not require either reasonable suspicion or probable cause is whether a reasonable person would believe that he is free to walk away.

The "free to walk away" test is, it must be acknowledged, a legal fiction. As one court observes, "of course . . . few people . . . would ever feel free to walk away from any police question." *United States v. Cardoza*, 129 F.3d 6, 16 (1st Cir. 1997); *see generally* Daniel J. Steinbock, *The Wrong Line Between Freedom and Restraint: The Unreality, Obscurity, and*

*Incivility of the Fourth Amendment Consensual Encounter Doctrine*, 38 San Diego L. Rev. 507, 561 (2001) (contrasting legal fiction of consensual encounter doctrine and reality of encounters).

Consequently, the focus "is not really whether a reasonable person would feel free to leave, but rather whether the police officer was acting coercively." Stephen Saltzburg & Daniel Capra, *American Criminal Procedure* 219 (9th ed. 2010). "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Tillman*, 963 F.2d at 142 (quoting *Florida v. Bostick*, 501 U.S. 429, 434 (1991)). "Examples of circumstances that might indicate seizure are the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *United States v. Carr*, 674 F.3d 570, 574 (6th Cir. 2012) (quotation marks omitted) (quoting *United States v. Peters*, 194 F.3d 692, 697 (6th Cir. 1999)); *see, e.g.*, *United States v. Collis*, 699 F.2d 832, 835 (6th Cir. 1983).

In this case, the police officers have acknowledged that Defendant was not free to walk away from the encounter. When he attempted to do so, in fact, Detective-Lieutenant Uribe and Detective Box formed a "triangle pattern." Suppression Hr'g I Tr. 14:1. Boxing in Defendant, the officers effectively preventing him from walking away. The encounter was not consensual in either fact or legal fiction. Rather, Defendant was temporarily detained.

**B**

Being detained for committing a traffic violation,[1] "even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." *Whren v. United States*, 517 U.S. 806, 809–10 (1996).

---

[1] Walking down a street instead of the sidewalk is a violation of the Michigan Vehicle Code. Mich. Comp. Laws § 257.655(1). To state the obvious, that Defendant was a pedestrian, not motorist, is a distinction without a

Therefore, the stop is "subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." *Id*. Reasonableness in this context depends on the presence of probable cause — "so long as the officer has probable cause to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful." *United States v. Freeman*, 209 F.3d 464, 466 (6th Cir. 2000) (quoting *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993)); *see, e.g.*, *United States v. Copeland*, 321 F.3d 582, 594 (6th Cir. 2003) (upholding stop of defendants for parking violation); *United States v. Johnson*, 242 F.3d 707, 710 (6th Cir.2001) (upholding stop of defendant for broken taillight); *United States v. Hill*, 195 F.3d 258, 265 (6th Cir. 1999) (upholding stop of defendants for speeding); *United States v. Akram*, 165 F.3d 452, 455 (6th Cir. 1999) (upholding stop of defendant for failure to signal a lane change); *United States v. Palomino*, 100 F.3d 446, 448 (6th Cir. 1996) (upholding stop of defendant for weaving in traffic); *United States v. Myers*, 102 F.3d 227, 232 (6th Cir. 1996) (upholding stop of defendant for expired license tag); *United States v. Bradshaw*, 102 F.3d 204 (6th Cir. 1996) (upholding stop of defendant for altered temporary license certificate).

Reasonableness, as noted, is an objective standard — an officer's subjective motivation for the stop does not factor into the analysis. *Whren*, 517 U.S. at 812–13; *see generally* Caleb Mason, *Jay-Z's 99 Problems, Verse 2: A Close Reading with Fourth Amendment Guidance for Cops and Perps*, 56 St. Louis U. L.J. 567, 571, 575–76 (2012).

Consequently, pretext is not a defense. "That is to say, an officer may stop a [person] for a traffic violation when his true motivation is to search for contraband, as long as the officer had probable cause to initially stop the [person]." *Hill*, 195 F.3d at 265 (citations omitted) (citing

---

difference for purposes of analyzing the reasonableness of the detention based on the alleged traffic violation. *See, e.g.*, *Durruthy v. Pastor,* 351 F.3d 1080, 1089–91 (11th Cir. 2003) (applying Florida law which provided "[w]here sidewalks are provided, no pedestrian shall, unless required by other circumstances, walk along and upon the portion of a roadway paved for vehicular traffic").

*Whren*, 517 U.S. at 812–13; *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir.1993) (en banc)).  The Sixth Circuit elaborates:

> We focus not on whether a reasonable officer "would" have stopped the suspect (even though he had probable cause to believe that a traffic violation had occurred), or whether any officer "could" have stopped the suspect (because a traffic violation had in fact occurred), but on whether this particular officer in fact had probable cause to believe that a traffic offense had occurred, regardless of whether this was the only basis or merely one basis for the stop.  The stop is reasonable if there was probable cause, and it is irrelevant what else the officer knew or suspected about the traffic violator at the time of the stop.

*Johnson*, 242 F.3d at 709 (quoting *Ferguson*, 8 F.3d at 391).

Stopping a person for a traffic violation, the Sixth Circuit further instructs, "is more akin to an investigative detention rather than a custodial arrest."  *Hill*, 195 F.3d at 264.  Therefore, "Reasonable police conduct under such circumstances is such that any subsequent detention after the initial stop must not be excessively intrusive in that the officer's actions must be reasonably related in scope to circumstances justifying the initial interference."  *Hill*, 195 F.3d at 264 (citations omitted) (citing *United States v. Palomino*, 100 F.3d 446, 449 (6th Cir.1996)).  "Once the purpose of the traffic stop is completed, a [person] cannot be further detained unless something that occurred during the traffic stop caused the officer to have reasonable, articulable suspicion that criminal activity was afoot."  *Hill*, 195 F.3d at 264.

The undisputed evidence in this case is that the encounter began when the officers saw Defendant walking down the center of a sidewalk-lined street.  As noted, the Michigan Vehicle Code provides: "Where sidewalks are provided, a pedestrian shall not walk upon the main traveled portion of the highway."  Mich. Comp. Laws § 257.655(1).  "A police officer who witnesses a person violating [the Michigan Vehicle Code]," the code further provides, "may stop the person, detain the person temporarily . . . and prepare . . . a written citation, which shall be a notice to appear in court."  § 257.742(1).

Based on Defendant's conduct, Detective-Lieutenant Uribe and Detective Box had probable cause to initiate the stop. Before the officers completed the ostensible purpose of the stop — speaking with Defendant regarding the traffic violation — the undisputed evidence is that they saw the silhouette of the gun in Defendant's pocket. Because the police were acting lawfully when the outline of the gun became plainly visible, the subsequent search and seizure was reasonable. *See generally Texas v. Brown*, 460 U.S. 730, 739 (1983) (discussing plain view doctrine).

In sum, police may lawfully stop a person that they observe committing a traffic violation. And if during the course of the lawful stop the police observe contraband, they may seize it immediately. In this case, the officers did not violate Defendant's Fourth Amendment rights.

### III

Accordingly, it is **ORDERED** that Defendant's motion to suppress (ECF No. 16) is **DENIED**.

It is further **ORDERED** that it is **DETERMINED** that the time from March 6, 2012, through July 31, 2012 be excluded pursuant to 18 U.S.C. § 3161(h)(1)(D).


Dated: July 31, 2012

                                                s/Thomas L. Ludington
                                                THOMAS L. LUDINGTON
                                                United States District Judge

-13-

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 31, 2012.

Tracy A. Jacobs<br>
TRACY A. JACOBS